Rocco P. DIGIOVANNI, Jr., Appellee,

v.

TRAYLOR BROTHERS, INC., Appellant.

No. 90–1957.

United States Court of Appeals,
First Circuit.

Heard Dec. 3, 1991.

Decided March 4, 1992.

Rehearing and Rehearing En Banc
Denied March 27, 1992.

Andrew Rothschild with whom Eric D. Paulsrud, John D. Husmann, and Lewis, Rice & Fingersh, St. Louis, Mo., were on brief, for appellant.

David B. Kaplan, with whom Thomas M. Bond, The Kaplan Bond Group, Boston, Mass., Paul Gallogly, and Lovett, Schefrin, Gallogly & Harnett, Providence, R.I., were on brief, for appellee.

Before BREYER, Chief Judge, BAILEY ALDRICH, Senior Circuit Judge, CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, TORRUELLA, SELYA and CYR, Circuit Judges.

## OPINION EN BANC

BAILEY ALDRICH, Senior Circuit Judge.

Defendant petitions for rehearing on the single issue of Jones Act recovery, renewing its claim that plaintiff, a member of the carpenter's union, is not a seaman, and the barge, the BETTY F, was not to be regarded as a vessel, particularly in light of a number of recent cases, notably in the Fifth Circuit. It asks us to reconsider our holding in *Bennett v. Perini Corp.*, 510 F.2d 114 (1st Cir.1975). Defendant asserts that, by speaking in terms of vessels, we have extended the concept of special protection needed for seamen exposed to the perils of the sea to workers who are not even theoretically so endangered. This, allegedly, is a carry-over of outmoded Supreme Court decisions, *post.* We will reconsider.

Briefly, the facts are these. The BETTY F was a barge, 100 feet in length, with a 40 foot beam and a raked bow and stern, and with nautical equipment, such as navigation and anchor lights. In all respects it met the commonly understood characteristics of a vessel, and, indeed, was inspected by the Coast Guard. It had no means of self-propulsion, except that positional movement could be achieved by manipulat-

ing its spud anchors. Its current use was to float at the Jamestown, Rhode Island, bridge, bearing a crane that was being used for bridge construction. Its permanent station was Davisville, Rhode Island, from which it was towed, by a tug, from time to time, to perform various shore jobs. It had been at the Jamestown bridge for a month. It was positioned about the bridge, and moved away from the pilings at night, to prevent damage.

Plaintiff's principal duty was to handle a tag line to guide the crane, but he also did maintenance work, such as painting, and tended lines. Although he was attached to the BETTY F, at the time of his injury he was standing on the deck of a supply barge in order better to manipulate the line. Its deck proved to be slippery, and he fell. The supply barge was in general use to carry supplies, but also served as a work platform.

The district court put special questions to the jury as between plaintiff being a Jones Act seaman and a harbor worker, and stated it could find the former—with greater rights—if he was attached to a vessel. Following *Bennett*, it stated, "A special purpose structure not usually employed as a means of transport by water, but designed to float on water may also be considered a vessel," and said nothing about its current use. The jury answered that plaintiff was a seaman, and defendant, having duly saved its rights, appealed. A panel, unanimous because it felt bound by *Bennett*, affirmed. This petition followed.

The Jones Act itself, 46 U.S.C.App. § 688, does not use the words ship and vessel, and speaks only of seamen, but courts have naturally spoken of seamen in terms of ships, vessels, and voyages. Thus in the recent case of *McDermott International, Inc. v. Wilander*, ― U.S. ―, 111 S.Ct. 807, 814, 112 L.Ed.2d 866 (1991), the Court repeated the definition given in *Warner v. Goltra*, 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254 (1934), "a seaman is a mariner of any degree, one who lives his life upon the sea. It is enough that what he does affects 'the operation and welfare of the ship when she is upon a voyage.'" *Warner*, 293 U.S. at 157, 55 S.Ct. at 47 (quoting *The Buena Ventura*, 243 F. 797, 799 (S.D.N.Y.1916)); *see also, Norton v. Warner Co.*, 321 U.S. 565, 572, 64 S.Ct. 747, 751, 88 L.Ed. 931 (1944). And, of course, a vessel does not cease to be a vessel when she is not voyaging, but is at anchor, berthed, or at dockside. *See Powers v. Bethlehem Steel Corp.*, 477 F.2d 643, 648 (1st Cir.), *cert. denied*, 414 U.S. 856, 94 S.Ct. 160, 38 L.Ed.2d 106 (1973). This practical fact availed the Court to hold that stevedores substituting for seamen in doing conventional seamen's work when the vessel was docked should equally come under the Act. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The reasoning was that the stevedore was "incurring a seaman's hazards." *Id.* at 99, 66 S.Ct. at 879. In point of fact this could be said to be making the exception the rule. Seamen who go down to the sea in ships incur special hazards on the sea, not at dockside.[1] The reasoning that favors not interrupting their coverage during a temporary cessation of those risks does not equally favor opening the coverage to workers who substitute for seamen only during non-hazardous, non-voyage, intervals. This, however, was once law.[2] The battle between the Court and Congress, met by revisions in the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat. (part 2) 1424, as amended, 33 U.S.C. §§ 901–950, detailed in *Wilander*,

---

1. Because *Wilander* has now quoted it with approval, we repeat Chief Justice Stone's dissent in *Sieracki*. "Seamen are in some sort co-adventurers upon the voyage; and lose their wages upon casualties, which do not affect artisans at home. They share the fate of the ship in cases of shipwreck and capture. They are liable to different rules and sufferings from landsmen." 328 U.S. at 105, 66 S.Ct. at 882 (citing *Reed v. Canfield*, 20 F.Cas. 426, 428 (C.C.D.Mass.1832)).

2. One member of this panel still recalls *Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), where we were reversed for denying the warranty of seaworthiness to a longshoreman who never set foot on the ship, but who was injured on the dock by unloaded cargo that had been improperly packaged, a defect held to make the ship unseaworthy, to plaintiff's benefit. Justice Harlan dissented. *Gutierrez* is now flotsam.

**1122**

111 S.Ct. at 810–13, was won by Congress. Longshoreman and seaman status are now mutually exclusive. 111 S.Ct. at 817. *"All who work at sea* in the service of a ship face those particular perils to which the protection of maritime law, statutory as well as decisional, is directed." *Id.* (emphasis supplied). We followed that concept to a considerable extent in *Powers,* 477 F.2d 643, *ante,* but we did so in terms of whether the structure was a vessel. The structure on which plaintiff was working was a raft, made of 12 × 12 timbers bonded together, used as a floating platform for pile workers and carrying sandblasting equipment and forms under piers to be placed around piles. We held it was not a vessel in spite of "occasional 'voyages'—when towed by workboat from one pier to another." [3] *Id.* at 647.

> Rafts, of course, may be designed or used 'to encounter perils of navigation'.... But we cannot reasonably describe the present raft as other than a floating stage. Even with men and equipment on it, its *movement,* amounting mostly to a positioning under the pier *incidental to its intended use, was not navigation.*

*Id.* (emphasis supplied). Later in the opinion, we remarked that "the law of admiralty [is] 'designed and molded to handle problems of vessels relegated to ply the waterways of the world.'" *Id.* at 648 (citing *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 269, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972)). Two years thereafter, however, we moved a long way from a waterway, holding that a pier worker who fell from a pier onto another land-based platform could recover under the Jones Act because the barge on which he also worked, Scow 101, could be found to be a vessel. *Bennett v. Perini Corp.,* 510 F.2d 114 (1st Cir.1975). In a comparatively brief discussion, we distinguished *Powers,* saying that Scow 101's

> seagoing range and versatility are greater.... To be a vessel, the purpose and business must *to some reasonable degree be the 'transportation* of passen-

gers, cargo, or equipment from place to place across navigable waters.' *Powers* at 477 F.2d 647. *A major function* of Scow 101 *appears to have been* the *transportation* of the structural materials and tools used to build the bridge and the crane across the navigable waters of Narragansett Bay.

510 F.2d at 116 (emphasis supplied).

Having determined that because of its "major function" of transportation, the scow was a vessel, the *Bennett* court faced the question whether plaintiff " 'contributed to the function ... or to the accomplishment of its mission.'" *Id.* (quoting *Offshore Co. v. Robison,* 266 F.2d 769, 779 (5th Cir.1959). We noted that, as a carpenter, plaintiff spent much of his time on the pier. However,

> there was evidence that a major part of the carpentry work was regularly done on the deck of Scow 101, where the additional space provided a necessary platform for constructing and reworking the panels.

> .   .   .   .   .

> [T]he 'mission' of Scow 101 was to provide a support base for the construction of the bridge piers. Appellant's duties, if not obviously maritime, related to that function and were arguably essential for its satisfactory performance.

510 F.2d at 117. Thus while *Powers'* raft's transportation of sandblasting equipment from pier to pier, and "through Boston Harbor to other jobs," was "incidental," to its "intended use," Scow 101's transportation of a crane across Narraganset Bay was "to some reasonable degree" a "major function," and made the pier worker a seaman.

This produced a difficult dividing line. It is particularly troublesome in light of the fact that plaintiff Bennett was not a user of the crane, and thus connected with what was transported, but was simply using the floating deck space, comparable to the *Powers* raft, which this court described as "an extension of the pier, itself an extension of the land." 477 F.2d at 648. Nor, if

**3.** "It had ... also been towed through Boston harbor to other jobs." 477 F.2d at 645.

transportation—the voyage—is the key to maritime responsibility, did the *Bennett* court make any mention of the length of jobs, and consequent voyage frequency. What we did was quote the amorphous wording of the *Offshore Company* opinion, "The 'injured workman [can go to the jury if he] was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water).'" 510 F.2d at 115 (quoting *Offshore*, 266 F.2d at 779), rather than the language of *Powers* stressing "special purpose floating structures whose function requires exposure to the hazards of the sea." 477 F.2d at 647.

■ This language from *Offshore* did not survive. Many decisions later, in *Bernard v. Binnings Construction Co.* 741 F.2d 824 (5th Cir.1984), *Offshore* was relegated to a footnote. Floating is not enough. *Id.* at 828 n. 13. Nor is "capability of movement across navigable waters." *Id.* at 829. Rather, the test is whether it

> was designed [4] or used primarily for the transportation of cargo, equipment or persons across navigable waters or was, at the time of Bernard's injuries, engaged in navigation.

*Id.* The court also noted

> that a structure whose purpose or primary business is *not* navigation or commerce across navigable waters may nonetheless satisfy the Jones Act's vessel requirement if, at the time of the worker's injury, the structure was actually in navigation.

*Id.* (emphasis in original).

■ This standard, as applied in a number of other Fifth Circuit cases,[5] looking to use, rather than simply to the physical characteristics of the structure, does appear a reasonable resolution of Jones Act principles as against mere definitions of vessels to convert longshoremen into seamen. A worker becomes a seaman not by reason of the physical characteristics of the

structure to which he is attached, but because its being operational "in navigation" exposes him to "a seaman's hazards." He is not exposed by what the vessel did in the past, or by its future potential, and to give him these special benefits by mechanical definitions without the exposure is misplaced generosity as in *Gutierrez*, n. 2, *ante*. Just as we relied on *Offshore* in the past, we believe we should now accept the Fifth Circuit's improved version. In sum, if a barge, or other float's "purpose or primary business is *not* navigation or commerce," then workers assigned thereto for its shore enterprise are to be considered seamen only when it is in actual navigation or transit.

That there should be a varying status designation depending on the activity at the moment is not a novel concept. In *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), a longshoreman who, because unloading, would have had unseaworthiness recovery under the Jones Act, per *Gutierrez*, for a ship-caused injury, was injured instead using the stevedore's equipment. Recovery was not allowed. We believe our division of responsibility to the activity equally appropriate.

Our rule is also in entire accord with *Wilander*'s language quoted in the fifth paragraph of this opinion and in n. 1, *ante*. In holding that every member of the ship's complement comes within the Jones Act, *Wilander* referred to the "voyage," and "vessels in navigation." It spoke not in terms of the ship, but of "[a]ll who work at sea in the service of a ship [and] face those particular perils to which the protection of maritime law, statutory as well as decisional, is based." 111 S.Ct. at 817.

Again, more recently in *Southwest Marine, Inc. v. Gizoni*, —— U.S. ——, 112 S.Ct. 486, 494, 116 L.Ed.2d 405 (1991), where the plaintiff was working on a float-

---

**4.** Even this word was uncalled for. Current use, not previous purpose, should be the test. *Ducrepont v. Baton Rouge Marine Enters., Inc.,* 877 F.2d 393, 396 (5th Cir.1989).

**5.** *E.g., Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 293 (5th Cir.1990); *see also Hurst v. Pilings & Structures, Inc.,* 896 F.2d 504 (11th Cir.1990).

ing platform, the Court referred to the opinion below, saying,

> The Ninth Circuit concluded that questions of fact existed regarding whether the floating platforms were *vessels in navigation,* and whether Gizoni had sufficient connection to the platform to qualify for seaman status.

(Emphasis supplied.) What is particularly interesting is the record which the Court held presented a jury question on each of these issues. It appeared from the opinion below, *Gizoni v. Southwest Marine, Inc.,* 909 F.2d 385 (9th Cir.1990), that defendant was a ship repairer who used floating platforms to support the workmen, and to carry materials and equipment. Plaintiff was on such a platform engaged in transporting a rudder to a ship when his foot went through the deck. Although plaintiff was a rigging foreman, his duties included handling lines, and he occasionally served as a lookout and gave maneuvering signals to the tugboat operator. 909 F.2d at 387. The platform, in other words, at the time of plaintiff's injury, was engaged in transportation, and plaintiff was a participant in that operation.

■ Under our rule we would be more favorable to the worker than was the *Gizoni* Court, if its language as to there being an issue of fact be regarded as a ruling. Clearly we would have felt the worker within the exception even if, during actual repair work to a floating ship, there was no navigation or commerce. But what is even more clear is that the present plaintiff does not measure up to *Gizoni.* The BETTY F had transported nothing for a month since it left defendant's headquarters in Davisville. Since then it was simply moved about the piers for working convenience, and at night for safety. This was hardly navigation or commerce, and did not diminish the primary nature of the platform's shore use and purpose. *See Ellender v. Kiva Construction & Engineering, Inc.,*

909 F.2d 803, 807 (5th Cir.1990). Correspondingly, that plaintiff occasionally adjusted lines for pier movement and the rise and fall of the tides, did not expose him to the risks of a voyage.

■ There is a suggestion that the supply barge, on which plaintiff was injured, was operating as a vessel. This barge was in general use, and was not "attached" to the BETTY F, and plaintiff was not "assigned permanently" thereto. *Bennett,* 510 F.2d at 116. Nor did he use it except as a work platform. Whether plaintiff is to be considered a seaman must depend upon the BETTY F.

A final word. Our denying Jones Act recovery does not end this case. The court put alternate questions to the jury, posing simple negligence under the LHWCA if the jury did not answer the Jones Act questions favorably. Since it did answer favorably, it did not answer the alternate negligence questions. In all fairness, there should be a new trial, with that heavier burden.

*Reversed and remanded for further proceedings consistent herewith.*

TORRUELLA, Circuit Judge, with whom BOWNES, Senior Circuit Judge, joins (Dissenting).

William Shakespeare tells us in a famous passage from *Romeo and Juliet* that labels are not important, but rather that content is what counts.[6] In more recent times, Gertrude Stein had similar advice.[7] Although poetic philosophy seems far removed from the hard world of maritime torts, I believe that the counsel found in those quotations has definite relevance to the issue that separates my views from those of my colleagues in the majority.

Notwithstanding the lack of a statutory definition for the term "vessel" in the Jones Act, 46 U.S.C.App. § 688,[8] at least twenty-four (24) federal maritime or maritime related laws[9] define "vessel" in such

---

6. "What's in a name? That which we call a rose By any other name would smell as sweet." Shakespeare, William, *Romeo and Juliet.* II, ii, 43.

7. "Rose is a rose is a rose is a rose." Stein, Gertrude, *Sacred Emily* (1913).

8. 46 U.S.C.App. § 688:
   Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury.

9. *See* Appendix to this opinion.

manner as to clearly include the BETTY F within the scope of their description. The BETTY F is thus a "vessel" under the Shipping Act, 46 U.S.C. § 2101(45), and the Merchant Marine Act, 46 U.S.C.App. § 801. It is covered as such by the International and Inland Rules of the Road, 33 U.S.C. §§ 1601(1), 2003(a), can be mortgaged under the Federal Ship Mortgage Insurance Act, 46 U.S.C. § 1271(b), must have its bottom painted within the restrictions of the Antifouling Paint Control Act, 33 U.S.C. § 2402(11), and even falls within the definition found in the Sentencing Reform Act, 18 U.S.C. § 3667. In contrast, I have found no federal maritime statute which would label the BETTY F anything other than a vessel. It would seem that the weight of these Congressional pronouncements alone would be enough to sustain appellee's case if for no other reason than by its recognition of the time honored doctrine of *in pari materia*. *See McDermott Int'l, Inc. v. Wilander,* — U.S. —, 111 S.Ct. 807, 811, 112 L.Ed.2d 866 (1991); *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952); *United States v. Porter,* 591 F.2d 1048, 1053 (5th Cir.1979) (quoting *Morissette,* 342 U.S. at 263, 72 S.Ct. at 249).

Because "[t]he inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel, and the employee's precise relation to it." *Southwest Marine, Inc. v. Gizoni,* — U.S. —, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991); *McDermott Int'l, Inc. v. Wilander,* 111 S.Ct. at 818. I believe that it is useful to spell the facts out in somewhat greater detail than is done in the majority opinion.

## THE FACTS

Appellee was injured aboard a supply barge while tending tag lines to a crane aboard the barge to which he was assigned, the BETTY F. These two barges worked together with the supply barge not only carrying supplies to be used aboard the BETTY F, but more significantly, transporting part of BETTY F's crane at the time of the accident.

The BETTY F is a typical steel-hulled barge designed to transport cargo or act as a work platform. It is 100 feet in length overall, has a 40 foot beam, raked bow and stern, and carries a roll-on crane in its aft area. It has toilet facilities for the crew, and what amounts to a galley in the form of an enclosed cafeteria with a stove and refrigerator, where the crew regularly take their meals. A tool shack and a sitting area are located in its bow section. The evidence presented at trial established that this vessel is routinely inspected by the Coast Guard for compliance with its regulations, as well as by surveyors for marine insurance purposes. Sea trials are also conducted to determine its seaworthiness and insurability.

As part of its compliance with Coast Guard requirements, the BETTY F had port and starboard navigation lights which were used when the barge was moved at night. It also carried and used anchor signals when not in movement, white balls which are hoisted when working at anchor in day time and a white anchor light and whistle for working at night. As required by regulations, its name and home port, "Wilmington, Delaware," are painted on its stern. Plimsoll marks, indicating its load lines, are painted on its sides as is normally the case with other vessels. By observing these markings, the BETTY F's ballast is periodically shifted, thus maintaining a seaworthy trim. The BETTY F was frequently boarded and inspected by the Coast Guard pursuant to its legal duty to see that vessels are in compliance with the maritime laws of the United States. *See* 14 U.S.C. § 2; *Dougherty v. Santa Fe Marine Inc.,* 698 F.2d 232, 235 (5th Cir.1983) (The failure to follow any Coast Guard regulation which is the cause of an injury establishes negligence per se).

The BETTY F was based in Davisville, Rhode Island, from where it was towed by a tug to its various work locations, including its workplace at the time of appellee's injury, a bridge under construction in Jamestown, Rhode Island. The tug moved the BETTY F "to whatever area we were going to." It was "moved quite a bit." In August, the month before appellee's accident, the BETTY F had been outfitted in Davisville. Although a tug was used to

move the BETTY F most of the time, it also had four spud anchors which could be used to reposition the barge once on location. At the location in question, the BETTY F was moved away from the bridge's pilings every night to prevent damage by the tidal surge.

Appellee, as well as the rest of the BETTY F's crew, were transported to work each day from Davisville by a crew boat. Although appellee's principal duties on the BETTY F were as a tagman for the crane, his work also included typical able seaman's duties aboard a steel vessel: chipping, painting and providing basic maintenance to the hull, tending mooring lines, fendering the vessel, setting and resetting the anchors, moving the barge away from the bridge every night, and ballasting the hull. When moved by the tug, the BETTY F's crew, including appellee, worked together with the tug's crew and under the tug captain's orders. In fact, many times appellee would actually be physically aboard the tug during these operations.

As previously indicated, appellee was working on the supply barge when he was injured. This barge is an integral part of the BETTY F's operation, and has no separate name or identification. It is 80 feet in length and has a 40 foot beam. Towed by a tug, it traveled back and forth on an almost daily basis from its main base in Davisville, bringing materials and equipment to the BETTY F.

The record contains additional information, which although admittedly less relevant, adds a definite maritime flavor to the activities aboard the BETTY F. At least part of the BETTY F's crew was composed of former merchant seamen. The crew wore life jackets while working aboard the BETTY F. The *lingua franca* of the crew/witnesses with reference to the BETTY F is seaborn in nature, i.e., "crew," "aboard," "load lines," "ballast," "an-

chors," "bow," "stern," "forward," "aft," "alongside," "midships," "deck" and "ashore." This terminology is found throughout the record. Although it might be argued that this is stretching a self-serving argument, I point out that this language was not only used by appellee's witnesses but also by appellant's attorney throughout the trial, and his expert witness, Davis C. Du Bois, who at all times during his testimony referred to the BETTY F as a "vessel." I suggest that this conduct reflects an acceptance by appellant of an undeniable reality, at a time when the status of the BETTY F as a vessel was taken for granted.[10] In fact, all who dealt with the BETTY F, the Coast Guard, its crew, its owners, that is, all except this Court, treated the BETTY F as if it were a vessel, not something else. Lest we forget, no one argues that the BETTY F is physically or structurally any different than the thousands of similar barges which ply the oceans of the world, or that the BETTY F is incapable of engaging in such commerce. Rather, the downgrading of the BETTY F to non-vessel status seems to be anchored on the frequency, or more accurately, the infrequency, of its voyaging.

## DISCUSSION

In my opinion the majority's change in course fails to take into account the Supreme Court's traditionally liberal construction in deciding who is a "seaman" under the Jones Act. *See Cox v. Roth*, 348 U.S. 207, 210, 75 S.Ct. 242, 244, 99 L.Ed. 260 (1955) (The Jones Act "As welfare legislation ... is entitled to a liberal construction to accomplish its beneficent purposes.") (quoting *Cosmopolitan Co. v. McAllister*, 337 U.S. 783, 790, 69 S.Ct. 1317, 1321, 93 L.Ed. 1692 (1949)). We find the most recent expression of this unswerving trend in the Court's unanimous decisions in *Southwest Marine, Inc. v. Gizoni, supra*, and *McDermott Int'l Inc. v. Wilander*, 111 S.Ct. at 814 ("[t]he Jones Act is a remedial statute").

---

**10.** I might add, only in half jest, that people usually do not name non-vessels. This seems to indicate that the BETTY F's owners considered

it enough of a "vessel" to treat it in a traditional vessel fashion.

In *Wilander*, Justice O'Connor clearly forecasts the outcome of our present case in her discussion of the need for the concept of a "vessel" to evolve with changing technology. *Wilander*, 111 S.Ct. at 812. Also of prime importance to the present controversy is the Court's citation, with apparent approval, of *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir.1959), from which we adopted the rule in *Bennett v. Perini Corp.*, 510 F.2d 114 (1st Cir.1975), which the majority now discards. *Id.* at 809. The "seaman" in *Wilander*, was a paint foreman whose duties "consisted primarily of supervising the sandblasting and painting of various fixtures and piping located on oil drilling platforms." *Id. Wilander was injured on one such platform.* At the time, he was assigned to a "paint boat" that contained equipment used in sandblasting and painting the platforms. *The drilling platforms were attached to the ocean floor* in a semi-permanent manner.

The facts in *Gizoni* sound equally familiar. Several floating work platforms were also involved, including a pontoon barge, two float barges, a rail barge, a diver's barge, and a *crane barge. Gizoni,* — U.S. at ——, 112 S.Ct. at 489. Gizoni was a rigging foreman on these working platforms and rode them as they were towed into place. The platforms were used to move equipment and supplies *around a shipyard and on and off vessels under repair.* These platforms had no power, means of steering, navigation lights, navigating aids or living facilities. They were moved by tugs, which positioned them as needed. Gizoni occasionally served as lookout and handled lines from the crew. He was injured while on a platform being used to transport a rudder *from the shipyard to a floating drydock in that yard.*

In *Wilander* the Court said that the issue of who is a "seaman" under the Jones Act [i.e., an employee who contributes to the functions or mission of a vessel], is better characterized as a mixed question of law and fact than as a pure question of fact for the jury. *Wilander*, 111 S.Ct. at 818. But if there are questions of fact

"regarding whether the floating platforms were vessels in navigation," these must be submitted to the jury. *Gizoni,* — U.S. at ——, 112 S.Ct. at 494. However, if "underlying facts are established, and the rule of law is undisputed, the issue is whether the facts meet the statutory standard." *Wilander*, 111 S.Ct. at 818. "[S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Id.* (citation omitted).

As I understand appellant's position, particularly considering the record before the district court, the facts as stated *ante* are not substantially in dispute. *See* Appellant's Brief at 3–7; Petition for Rehearing, at 4. Appellant did not present any evidence challenging appellee's witnesses and the facts dealing with the BETTY F. To this we must add that the BETTY F and the supply barge (and perhaps the crew boat) are a "group of vessels" (*see Gizoni,* — U.S. at ——, 112 S.Ct. at 489). Although I believe that as a matter of law it could be ruled that appellee was injured while working on a "vessel," I am willing for present purposes, to concede that it is still arguably a jury question. *Id.* We thus look to the new legal standard established by the majority.

Under *Bennett v. Perini Corp.*, 510 F.2d 114, 116 (1st Cir.1975), relied upon by both the district court and the panel:

> To be a vessel, *the purpose* and business must *to some reasonable degree* be the "transportation of passengers, cargo or equipment from place to place across navigable waters."

(Emphasis supplied) (quoting *Powers v. Bethlehem Steel Corp.*, 477 F.2d 643, 647 (1st Cir.), *cert. denied*, 414 U.S. 856, 94 S.Ct. 160, 38 L.Ed.2d 106 (1973)).

The Fifth Circuit's "standard," which is purportedly adopted by the *en banc* majority in place of *Bennett*, is found in *Bernard v. Binnings Construction Co.*, 741 F.2d 824, 829 (5th Cir.1984). In reality the Fifth Circuit sets two different standards:

a. The first: "[A] structure whose purpose or primary business is *not* navigation or commerce across navigable waters may nonetheless satisfy the Jones Act's vessel requirement if, at the time of the worker's injury, the

structure was *actually* engaged in navigation."

*Id.* (Second emphasis supplied).

    b.  The second: A Jones Act "vessel" is a structure which *"was designed* or used primarily for the transportation of cargo, equipment or persons across navigable waters *OR* was, at the time of [the] injuries, engaged in navigation."

*Id.* (Emphasis and capitals supplied.)

Thus, according to the Fifth Circuit a structure *not designed* for transportation must be in *actual navigation* to be a vessel. *See also Cook v. Belden Concrete Products,* 472 F.2d 999, 1002 (5th Cir.1973), *cert. denied,* 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973). If it *is designed* for transportation it does *not* necessarily have to be in actual navigation. I think it relevant to note that in discussing these standards, as applied to "a variety of special purpose structures," the *Binnings* court considers *"the purpose for which the craft was constructed* and the business in which it is engaged," *Binnings,* 741 F.2d at 829 (emphasis added) (quoting *Blanchard v. Engine & Gas Compressor Services Inc.,* 575 F.2d 1140, 1142 (5th Cir.1978) (citing *The Robert W. Parsons,* 191 U.S. 17, 30, 24 S.Ct. 8, 12, 48 L.Ed. 73 (1903))), as more conclusive than "the size of the structure, its ability to float, the permanence of its fixation to shore or bottom, and the fact of its movement or its capability of movement across navigable waters ..." *Id.* (footnotes omitted). As examples of special purpose structures held to be vessels, the *Binnings* court lists a submersible oil storage vessel facility (*Hicks v. Ocean Drilling & Exploration Co.,* 512 F.2d 817 (5th Cir.), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976)), a submersible drilling barge (*Producers Drilling Co. v. Gray,* 361 F.2d 432 (5th Cir.1966)), and a mobile drilling platform with retractable legs (*Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir.1959)).[11]

The new standard in the majority opinion is stated as follows:

    [I]f a barge or other float's "purpose or primary business is *not* navigation or commerce," then workers assigned thereto for its principal shore enterprise are to be considered seamen only when it is in actual navigation or transit.

*See* majority opinion, *ante* at 1123. Although this rule purports to follow *Binnings,* particularly when read in context with the rest of the majority opinion, it is clearly more restrictive than *Binnings.* It downgrades, if not totally eliminates, the "designed purpose of the structure" standard and substitutes actual navigation as the sole requirement. This goes far beyond what the Fifth Circuit, or for that matter any circuit, has decided, and will create a new split rather than mend old ones.

In addition to those already stated, there are, in my view, other important reasons for not adopting this new rule.

*Stare decisis.* The *Bennett* rule has been in effect since 1975. It is well understood and has been followed without undue difficulty by the bar and district courts. With due respect, I do not believe the new rule is a sufficient enough reason to depart from this established precedent, at the probable cost of creating uncertainty that will lead to an influx of litigation.

*The Bennett rule is a better rule.* The Bennett rule more accurately reflects the general maritime law, as is seen from the definition of the term "vessel" in the 24 statutes cited. Applying these definitions to the present situation would promote uniformity in maritime law. In contrast, the new standard will lead to much uncertainty as the same object may be a vessel or non-vessel from moment to moment. The same person, doing the same work, on the same object will receive different legal treatment depending on a totally fortuitous condition. This balkanization of maritime law will be

---

**11.** Although the majority states in its draft that the language in *Offshore* "did not survive [*Binnings*]," and that *Offshore* was "relegated to a footnote [in *Binnings*]," *ante* at 1122, I find the "designed to float on water" language in *Offshore* to be very much alive in the second *Binnings* rule quoted above.

for naught in resolving the owners' insurance problems, as they will still need protection against Jones Act claims for those instances in which the object is legally transformed into a vessel by reason of its movement.

As stated above, the new rule creates unpredictability and haphazardness in its application. For example, does "actual navigation" mean that once the barge comes to a stop and is anchored or docked, it no longer is a "vessel" even if the condition causing the casualty was created or arose while the now non-vessel was in movement? What about the inverse situation? What principled reason is there for distinguishing between a barge and an ocean liner once *it* is anchored or tied to the dock? Under *Wilander* a dance instructor teaching passengers the "cha-cha-cha" aboard an ocean liner tied to the dock is a "seaman," but under the new rule, appellee, who actually does much more traditional seaman's work, would be denied Jones Act protection because the BETTY F is secured to its spud anchors. What logical reason is there for such a distinction and how would such a rule be framed if it is to make sense? Is the BETTY F "in actual navigation" every night when it is moved away from the bridge or in the mornings when it is moved again alongside? The ambivalence raised by the new rule is endless. Given such uncertainties, is it prudent to change our present rule absent firmer guidance from the Supreme Court?

Finally, given the factual record in this case, I cannot see how even under the new standard, the majority can conclude, as a matter of law, that the BETTY F is not a "vessel." At the very least, the case should be retried on all issues, using the new standard on the Jones Act cause of action as well.

A vessel is a vessel is a vessel is a vessel.

I respectfully dissent.

### APPENDIX

a. Rules of Construction Act (1 U.S.C. § 3):

The word "vessel" includes every description of watercraft or other artificial contrivance used, *or capable of being used,* as a means of transportation on water. (Emphasis supplied.)

b. The Shipping Act (46 U.S.C. § 2101(45)):

["V]essel" has the same meaning given that term in Section 3 of Title 1.

c. Merchant Marine Act of 1920 (46 U.S.C.App. § 801):

[A]ll water craft and other artificial contrivances of whatever description and, at whatever stage of construction, whether on the stocks or launched, *which are used or are capable of being or are intended to be used* as a means of transportation on water. (Emphasis supplied.)

d. International Navigational Rules of 1977 (33 U.S.C. § 1601(1)):

"Vessel" means every description of watercraft, including nondisplacement craft and seaplanes, used *or capable of being used* as a means of transportation on water. (Emphasis supplied.)

e. The Inland Navigation Rules Act of 1980, Rule 3(a) (33 U.S.C. § 2003(a)):

The word "vessel" includes every description of watercraft, including nondisplacement craft and seaplanes, used *or capable of being used* as a means of transportation on water. (Emphasis supplied.)

f. Public Health Service Act (42 U.S.C. § 201(i)):

The term "vessel" includes every description of watercraft or other artificial contrivance used, *or capable of being used,* as a means of transportation on water, exclusive of aircraft and amphibious contrivances. (Emphasis supplied.)

g. Excise Taxes Act (26 U.S.C. § 5688(c)): ["V]essel" includes every description of watercraft used, *or capable of being used,* as a means of transportation in water or in water and air; ... (Emphasis supplied.)

h. Whaling Convention Act (16 U.S.C. § 916(e)):

Vessel: The word "vessel" denotes every kind, type or description of watercraft or contrivance subject to the jurisdiction of the United States used, *or capable of being used,* as a means of transportation. (Emphasis supplied.)

i. Neutrality Act of 1939 (22 U.S.C. § 456(c)):

The term "vessel" means every description of watercraft and aircraft *capable of being used* as a means of transportation on, under, or over water. (Emphasis supplied.)

j. Navigation Act of 1974 (33 U.S.C. § 1502(19)):

["V]essel" means every description of watercraft or other artificial contrivance used as a means of transportation on or through the water.

k. Deepwater Ports Act (33 U.S.C. § 1502(19)):

["V]essel" means every description of watercraft or other artificial contrivance used as a means of transportation on or through the water.

l. The Oil Pollution Act of 1990 (33 U.S.C. § 2701(37)):

["V]essel" means every description of watercraft or other artificial contrivance used, *or capable of being used,* as a means of transportation on water, other than a public vessel. (Emphasis supplied.)

m. The Sentencing Reform Act (18 U.S.C. § 3667):

As used in this section "vessel" includes every description of watercraft used, *or capable of being used* as a means of transportation in water or in water and air. (Emphasis supplied.)

n. The Communications Act of 1934 (47 U.S.C. § 153(w)(1)):

["V]essel" includes every description of watercraft or other artificial contrivance, except aircraft, used or *capable of being used,* as a means of transportation on water, whether or not it is actually afloat. (Emphasis supplied.)

o. The Tariff Act of 1930 (19 U.S.C. § 1401(a)):

The word "vessel" includes every description of watercraft or other contrivance used, *or capable of being used,* as a means of transportation in water, but does not include aircraft. (Emphasis supplied.)

p. The Interstate Act Against Importation and Exportation of Motor Vehicles, Vessels and Aircraft Act. (18 U.S.C. § 553(c)(3)):

["V]essel" has the meaning given that term in Section 401 of the Tariff Act of 1930 (19 U.S.C. 1401, *ante*).

q. The Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601(28)):

The term "vessel" means every description of watercraft or other artificial contrivance used, *or capable of being used,* as a means of transportation on water. (Emphasis supplied.)

r. The Anti–Gambling Act (18 U.S.C. § 1081):

The term "vessel" includes every kind of water and aircraft or other contrivance used *or capable of being used* as a means of transportation on water, or on water and in the air, as well as any ship, boat, *barge,* or other watercraft or any structure capable of floating on the water. (Emphasis supplied.)

s. The Federal Ship Mortgage Insurance Act (46 U.S.C. § 1271(b)):

The term "vessel" includes all types, whether in existence or under construction, of passenger cargo and combination passenger-cargo carrying vessels, tankers, tugs, towboats, *barges,* dredges and ocean thermal energy conversion facilities or plant ships which are or will be documented under the laws of the United States, ... (Emphasis supplied.)

t. The Contraband Seizure Act (49 U.S.C.App. § 787(a)):

The term "vessel" includes every description of watercraft or other contrivance used, or *capable of being used,* as a means of transportation in water, but does not include aircraft. (Emphasis supplied.)

u. The Antifouling Paint Control Act of 1988 (33 U.S.C. § 2402(11)):

The term "vessel" includes every description of watercraft or other artificial con-

trivance used, *or capable of being used,* as a means of transportation on water. (Emphasis supplied.)

v. The Interstate Commerce Act (49 U.S.C. § 10102(28)):

The term vessel means a watercraft or other artificial contrivance that is used, *is capable of being used, or is intended to be used,* as a means of transportation by water. (Emphasis supplied.)

w. The Submarine Cable Act (47 U.S.C. § 30):

[T]he term vessel shall be taken to mean every description of vessel used in navigation, in whatever way it is propelled . . .

x. The Federal Water Pollution Control Act (33 U.S.C. § 1321(a)(3)):

["V]essel" means every description of watercraft or other artificial contrivance used, or *capable of being used,* as a means of transportation in water other than a public vessel. (Emphasis supplied.)