# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1292

_____

| | | |
|---|---|---|
| Ashley R. Bunch, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Eastern |
| Canton Marine Towing Co., Inc., a | * | District of Missouri. |
| Missouri Corporation; Sir Joseph, an | * | |
| inland river towboat, Her Engines, | * | |
| Boilers, etc., | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: April 14, 2005
Filed: August 23, 2005

_____

Before RILEY, McMILLIAN, and GRUENDER, Circuit Judges.

_____

RILEY, Circuit Judge.

Ashley Bunch (Bunch) was injured aboard the M/V Sir Joseph (Sir Joseph), a tugboat owned by Bunch's employer, Canton Marine Towing Company, Inc. (Canton). Bunch sued Canton and the Sir Joseph (defendants) under section 33 of the Merchant Marine Act of 1920, 46 U.S.C. app. § 688, commonly known as the Jones Act. The district court granted summary judgment to the defendants, concluding Bunch was not a "seaman" covered by the Jones Act, because Bunch "simply did not have a substantial connection to a vessel in navigation." We reverse.

## I.    BACKGROUND

Bunch worked as a barge cleaner at Canton's Missouri facility, a cleaning barge moored to the bed of the Missouri River. Almost every day, Bunch was ferried in the morning to the cleaning barge from Canton's Illinois facilities, then back for lunch and again to return home in the evening, usually aboard the Sir Joseph. On most days Bunch spent twenty minutes aboard the Sir Joseph. Cleaning third-party barges consumed Bunch's normal workday aboard the cleaning barge. Bunch cleaned barges on all but approximately ten of the 242 days he worked during his first year with Canton. On those approximately ten days, Bunch worked as a deckhand for a few hours on the Sir Joseph. Viewing the evidence most favorably to Bunch, for summary judgment purposes, the district court assumed Bunch spent, at most, ten percent of his work time as a deckhand.

The defendants concede the cleaning barge, where Bunch usually worked, originally was built for navigation. However, the cleaning barge was later moored to the bed of the Missouri River by spud poles, which are long steel or wood posts placed vertically through the hull of a vessel and embedded into the bed of a waterway to anchor a vessel. The cleaning barge generally was secured in position, but strong currents would shift the barge. The cleaning barge contained water pumps, vacuum tanks, cleaning tools, a generator, a CB radio, and a satellite. The cleaning barge did not have propellers and did not move by itself. During Bunch's tenure, the cleaning barge was moved once from the Illinois side of the river to the Missouri side, and when the barge arrived on the Missouri side, Canton put spud poles back into the riverbed to moor the barge.

On April 20, 2001, while Bunch was being ferried to the Illinois facilities, the Sir Joseph stopped to check if other barges required cleaning. Bunch and another employee climbed aboard the barges from the Sir Joseph. As the two climbed back aboard the Sir Joseph, Bunch fell and sustained injuries.

Bunch sued the defendants for damages under the Jones Act. The defendants moved for summary judgment, arguing Bunch could not recover under the Jones Act because he was not a seaman. The district court granted the motion, ruling Bunch could not qualify as a seaman, because he did not have a "substantial connection to a vessel in navigation." Bunch appeals, arguing he had a "substantial connection" to the cleaning barge, which was a "vessel in navigation." After Bunch appealed, the United States Supreme Court decided Stewart v. Dutra Construction Co., 125 S. Ct. 1118 (2005), wherein the Court clarified the definition of "vessel" under the Jones Act and the Longshore and Harbor Workers' Compensation Act (LHWCA).

## II.    DISCUSSION

"We review the district court's grant of summary judgment *de novo*." Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F.3d 1024, 1027 (8th Cir. 2003). We will affirm a "grant of summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . .' demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)).

The Supreme Court has observed, "seaman status under the Jones Act is a question of fact for the jury." McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 355 (1991). While the Court in Wilander was not asked "to reconsider this rule," it noted "the question of who is a 'member of a crew,' and therefore who is a 'seaman,' is better characterized as a mixed question of law and fact." Id. at 356. Thus, summary judgment is proper if the law and facts support one conclusion. Johnson v. Cont'l Grain Co., 58 F.3d 1232, 1235 (8th Cir. 1995). Both parties claim no factual disputes exist and this issue may be resolved as a matter of law based on the record.

-3-

Under the Jones Act, any "seaman" injured during the course of employment may bring a federal negligence claim. 46 U.S.C. app. § 688(a).[1] The Jones Act does not define the term "seaman." But in Chandris, Inc. v. Latsis, 515 U.S. 347, 368 (1995) (citation omitted), the Supreme Court established a two-part test for determining seaman status: (1) the "employee's duties must contribut[e] to the function of the vessel or to the accomplishment of its mission," and (2) the employee "must have a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature." The parties agree Bunch's duties contributed to a vessel's function. Thus, the sole issue is whether Bunch had a substantial connection to a "vessel in navigation." The defendants conceded at oral argument if the cleaning barge is a vessel in navigation, Bunch is a seaman under the Jones Act. Accordingly, we must determine whether the cleaning barge, upon which Bunch spent at least ninety percent of his work time, qualifies as a "vessel in navigation."

In Stewart, 125 S. Ct. at 1121, the Supreme Court held the Super Scoop, a dredge with only limited means of self-propulsion and moved long distances only by tugboat, was a vessel under the LHWCA. The Super Scoop navigated short distances of thirty to fifty feet every couple of hours by manipulating its anchors and cables. Id. Noting courts had long recognized similar craft as vessels, the Court observed that, at the time the LHWCA and the Jones Act were enacted, 1 U.S.C. "§ 3 defined the term 'vessel' for purposes of those statutes." Id. at 1125. This definition "requires only that a watercraft be 'used, or capable of being used, as a means of transportation on water' to qualify as a vessel. It does not require that a watercraft be used *primarily* for that purpose." Id. at 1128 (quoting 1 U.S.C. § 3). Nor does section 3 require a watercraft "be in motion to qualify as a vessel." Id. Furthermore, the requirement that a watercraft be a vessel in navigation for Jones Act purposes

---

[1]Maritime workers are classified as either sea-based or land-based due to the mutually exclusive relationship between the Jones Act and the LHWCA. See Stewart, 125 S. Ct. at 1123. "[A]ny person covered by the Jones Act is excluded from coverage under the LHWCA and vice versa." Johnson, 58 F.3d at 1235.

-4-

employs no less inclusive a definition than that used for the term "vessel" in other maritime contexts. Id. at 1128-29. Thus, the Court concluded any notion that the use of the term "vessel" under section 3 is considerably more inclusive than use of the term "vessel in navigation" under the Jones Act is no longer tenable. Id. at 1129. The "in navigation" requirement is relevant only "to whether the craft is 'used or capable of being used' for maritime transportation." Id. at 1128. The Court explained that a ship "permanently moored to the shore or the ocean floor can be cut loose and made to sail." Id. "The question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." Id. The Court has never indicated "a structure's locomotion at any given moment mattered." Id. Accordingly, in the context of the Jones Act, we look to the section 3 definition of "vessel," rather than attempting to discern additional meaning from the phrase "in navigation."

Acknowledging the distinctions between dredges and "more traditional seagoing vessels," the Supreme Court noted the similarities between nineteenth century dredges and the Super Scoop. Id. at 1125. The Court cited with approval The Alabama, 19 F. 544, 545 (S.D. Ala. 1884), in which the district court observed the dredge Alabama and its scows usually were moved by tow, as they had no means of self-propulsion other than "by use of anchors, windlass, and ropes." Neither the Alabama nor the scows were made for or adapted to carrying passengers or freight, nor had they ever been so employed. Id. Although the vessels "may have no motive power of their own, and be moved only by power applied externally," they still "ha[d] the capacity to be navigated in and upon the waters, and they [were] water-craft made for navigation." Id. at 546.

We recently held a floating tow barge was a vessel under the Clean Water Act, which employs the same definition of the term "vessel" as used in 1 U.S.C. § 3, the LHWCA, and other federal statutes. See United States v. Templeton, 378 F.3d 845, 849-50 (8th Cir. 2004) (cited in Stewart, 125 S. Ct. at 1128). In Templeton, the tow

barge, the Rand, floated on her own, was moored fifteen feet from shore, and was attached to spud poles by removable bolts, but had no operable engines. Id. at 847. In evaluating the Rand's status as a vessel, we observed,

> While we are aware "[t]he fact that it floats on the water does not make it a ship or vessel," Cope v. Vallette Dry-Dock Co., 119 U.S. 625, 627 (1887), the facts in this case lead to the conclusion the Rand was a vessel under the [Clean Water] Act. We fully appreciate the government's arguments, but if we were to adopt the government's definition of the term, "capable of use," we would have to equate the term to mean "current use," an interpretation the statutory language and the caselaw do not support. The Rand was "capable of use" as a vessel, albeit under tow. While it may have been inefficient or expensive to use the Rand as a vessel, those factors do not serve to strip the Rand of its vessel status. The Rand fits "into the category of many other vessels with similarly limited capacities." Although the Rand probably will never "slip her moorings" and set off toward open waters, she is nonetheless a towable vessel capable of use as a means of transportation on water.

Id. at 852 (certain citations omitted). We concluded the "expansive scope" afforded Congress's definition of the term "vessel" leads "to the inescapable conclusion the Rand was a vessel under the [Clean Water] Act." Id.

In contrast, courts have denied vessel status to those craft permanently moored or otherwise immovable. In Kathriner v. UNISEA, Inc., 975 F.2d 657, 659-60 (9th Cir. 1992), the Ninth Circuit ruled the UNISEA, a liberty ship converted into a fish processing plant, was not a vessel in navigation under the Jones Act because it was permanently moored, had permanent utility connections, had no movement capabilities, had no means of navigation, had no independent source of propulsion, and served no transportation function. The UNISEA was "designed as a floating factory–merely extending land over water for the purpose of increasing the usable space of a dock-side fish processing operation," after the ship "was converted to a

shrimp processing plant, a large opening was cut into her hull to allow for dock traffic," and, if put to sea, "she would surely sink." Id. Similarly, in Cope, 119 U.S. at 626-27, the Supreme Court ruled a dry-dock "moored and lying at [the] usual place" it occupied for over twenty years, was a "fixed structure" that was "permanently moored," not a temporarily anchored vessel. Also, in Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U.S. 19, 21-22 (1926), the Court concluded a wharfboat, secured by cables to the mainland; connected to local water, electricity, and telephone lines; and never "taken from place to place" or used to transport freight, "was not practically capable of being used as a means of transportation," and, therefore, did not qualify as a vessel.

Distinguishing these cases, the Stewart Court noted "the distinction drawn by the general maritime law between watercraft temporarily stationed in a particular location and those permanently affixed to shore or resting on the ocean floor." Stewart, 125 S. Ct. at 1127. "Simply put," the Court concluded, "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." Id.

The Stewart Court also specifically eschewed tests for vessel status focused on either a craft's "primary purpose" or whether the craft is in "actual transit" at the time of an accident. Id. at 1127-28. The district court in this case relied on other circuits' cases applying just such tests. See DiGiovanni v. Traylor Bros., Inc., 959 F.2d 1119, 1123 (1st Cir. 1992); Hurst v. Pilings & Structures, Inc., 896 F.2d 504, 506 (11th Cir. 1990); Bernard v. Binnings Constr. Co., 741 F.2d 824, 831 (5th Cir. 1984). The defendants also cite a subsequent Seventh Circuit case applying the same test. See Howard v. S. Ill. Riverboat Casino Cruises, Inc., 364 F.3d 854, 856-58 (7th Cir. 2004). Based on Stewart, we reject the district court's reliance on these cases and focus instead on whether the cleaning barge was "used, or capable of being used, as a means of transportation on water." See Stewart, 125 S. Ct. at 1128; 1 U.S.C. § 3.

The Stewart Court acknowledged "the seeming incongruity of grouping dredges alongside more traditional seafaring vessels under the maritime statutes." Stewart, 125 S. Ct. at 1129. However, quoting a Fourth Circuit case from over one hundred years ago, the Court observed, although it may be a "stretch of the imagination to class the deck hands of a mud dredge in the quiet waters of a Potomac creek with the bold and skillful mariners who breast the angry waves of the Atlantic[,] such and so far-reaching are the principles which underlie the jurisdiction of the courts of admiralty that they adapt themselves to all the new kinds of property and new sets of operatives and new conditions which are brought into existence in the progress of the world." Id. (quoting Saylor v. Taylor, 77 F. 476, 479 (4th Cir. 1896)).

We hold the cleaning barge was a vessel and, thus, a vessel in navigation under the Jones Act. In Templeton, after noting the Rand had inoperable engines and would need to be towed if she were to be moved, we concluded such facts were insufficient to strip the Rand of vessel status. Templeton, 378 F.3d at 850-52. The Rand also was connected to spud poles by bolts, "which could easily be removed, permitting the Rand to be towed because she floated on her own, which [was] sufficient to bestow 'vessel' status on her." Id. at 852. The undisputed facts of this case do not show the cleaning barge was permanently moored or anchored to the river bed, and the barge had been moved from its mooring to travel across the river during the time Bunch worked for Canton. Although the cleaning barge was secured in position, strong currents would shift the barge, belying the permanency of its mooring. Nor does the evidence show the barge had been taken out of service or rendered practically incapable of maritime transportation. See Stewart, 125 S. Ct. at 1128. Indeed, the district court concluded the cleaning barge was capable of movement and was moved.

The cleaning barge was built for use in navigation. The barge was moored in the river, rather than to the shore. The cleaning barge obviously floated, for if it did not, there would have been no need to moor it with spud poles. Under the defendants' interpretation that the cleaning barge was permanently moored during

-8-

Bunch's employment, the cleaning barge would have been permanently moored when it was on the Illinois side of the river, too. We find it difficult to conclude the cleaning barge is permanently moored on the Missouri side of the river any more than it was permanently moored while on the Illinois side. As the <u>Stewart</u> Court observed, even a permanently moored ship can be released and made to sail. <u>Id.</u> The Court has directed that we avoid a "snapshot" test allowing vessel status to turn on whether a watercraft is in motion at a given time. <u>Id.</u>; <u>see</u> <u>Templeton</u>, 378 F.3d at 352 (rejecting equating the term "capable of use" to mean "current use"). We heed that direction and avoid viewing the cleaning barge's current state in determining its status as a vessel.

We recognize the cleaning barge is near or at the outer limits of what this court would recognize as a vessel. We also recognize the cleaning barge in this case differs from the dredge in <u>Stewart</u> insofar as the dredge was capable of limited self-propulsion. However, this characteristic alone does not determine vessel status. A vessel is not defined by its capability for self-propulsion. The term "vessel" refers to "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." <u>Stewart</u>, 125 S. Ct. at 1129. Based on the Supreme Court's holding in <u>Stewart</u> and this court's holding in <u>Templeton</u>, we conclude the cleaning barge is a vessel, thereby making Bunch a seaman under the Jones Act.

## III.   CONCLUSION

The parties claim no factual disputes exist for a jury to decide, and we find no genuine issue as to any material fact. We reverse the district court's grant of summary judgment on Bunch's Jones Act claim and remand the case for further proceedings consistent with this opinion.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I agree with the Court that the district court's order of summary judgment should be vacated and the case remanded for further proceedings. However, because I believe the issue of whether Canton's cleaning barge is a "vessel" as defined by 1 U.S.C. § 3 requires a better developed record in light of *Stewart v. Dutra Const. Co.*, 125 S. Ct. 1118 (2005), I would remand the case to the district court and leave the issue to a finder of fact. Therefore, I respectfully dissent from the Court's holding that Canton's cleaning barge is a vessel under 1 U.S.C. § 3.

The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law" under the Federal Employers Liability Act, 45 U.S.C. §§ 51-60. *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 38 (1943) (quoting 46 U.S.C. § 688(a)). One of the predicate determinations for obtaining coverage under the Jones Act is whether the structure to which the worker is connected qualifies as a "vessel in navigation." *See Southwest Marine, Inc. v. Gizoni*, 502 U.S. 81, 88 (1991) (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355 (1991) as noting that "[t]he key to seaman status [under the Jones Act] is employment-related connection to a vessel in navigation"). Given the highly fact-intensive inquiry necessary to determine a structure's status, we have generally left to the finder of fact the question of what qualifies as a vessel within the meaning of the Jones Act. *See Slatton v. Martin K. Eby Const. Co., Inc.*, 506 F.2d 505, 510 (8th Cir. 1974) ("[W]hat is a vessel and who is a crew member are ordinarily jury questions."); *see also Stewart*, 125 S. Ct. at 1128 (noting that the inquiry into the status of the vessel "may involve factual issues for the jury"). As a result, and in spite of the riparian geography of our circuit, we do not have quite the ocean of case law on this issue that might be found in some of the other circuits.

-10-

In the order of summary judgment, the district court began its analysis of Canton's cleaning barge by noting that it was not a standard barge but instead was more akin to a floating work platform. The district court therefore turned to the case law of other circuits, which "[s]ince the *Slatton* decision, . . . have clarified the test for determining whether a special purpose structure is a vessel in navigation for Jones Act purposes." *Bunch v. Canton Marine Towing Co., Inc.*, No. 2:02-cv-55-DJS, slip op. at 9 (E.D. Mo. Jan. 6, 2004). These cases generally recognized the legal difficulty of classifying a structure as a vessel and instead developed tests for determining whether the alleged vessel was actually "in navigation."[2] This approach generally focused on the primary purpose of the structure, the status of the structure at the time of the accident, and whether any transportation function was merely incidental to the structure's primary purpose. *Id.* at 9. The district court, relying primarily on this "in navigation" jurisprudence, concluded that because "[t]here [was] no evidence that the cleaning barge was used for the transportation of cargo, equipment, or persons across navigable waters," *Bunch*, slip op. at 8, "the only conclusion which a reasonable

---

[1]*See, e.g., Howard v. S. Ill. Riverboat Casino Cruises, Inc.*, 364 F.3d 854 (7th Cir. 2004) (holding that an indefinitely moored dockside casino is a vessel but, because it has no transportation function or purpose, it is not "in navigation"); *Tonnesen v. Yonkers Contracting Co.*, 82 F.3d 30, 36 (2d Cir. 1996) (adopting, with minor modification, the Fifth Circuit's test for whether a vessel is "in navigation"); *DiGiovanni v. Traylor Bros., Inc.*, 959 F.2d 1119, 1123 (1st Cir. 1992) (en banc) (holding that "if a barge['s] . . . purpose or primary business is not navigation or commerce, then workers assigned thereto for its shore enterprise are to be considered seamen only when it is in actual navigation or transit" at the time of injury); *Kathriner v. UNISEA, Inc.*, 975 F.2d 657, 660 (9th Cir. 1992) ("Generally, floating structures are not classified as vessels in navigation if they are incapable of independent movement over water, are permanently moored to land, have no transportation function of any kind, and have no ability to navigate."); *Bernard v. Binnings Const. Co., Inc.*, 741 F.2d 824, 829 (5th Cir. 1984) (promulgating a three-factor test for whether a vessel is not "in navigation" for purposes of the Jones Act).

fact-finder could reach is that the moored cleaning barge is not a vessel in navigation under the Jones Act," *id.* at 10.

In *Stewart*, the Supreme Court eschewed this focus on a separate "in navigation" requirement. *Stewart*, 125 S. Ct. at 1128 ("[T]he 'in navigation' requirement is an element of the vessel status of a watercraft . . . [and] is relevant to whether the craft is 'used, or capable of being used' for maritime transportation."); *see also Uzdavines v. Weeks Marine, Inc.*, 03-40084, slip op. at 9-10 (2d Cir. Aug. 3, 2005) (noting that *Stewart* supercedes the Second Circuit's three-part test in *Tonnesen*). Instead, the Supreme Court held that a watercraft qualifies as a vessel under the Jones Act if it is "used, or capable of being used, as a means of transportation on water." *Stewart*, 125 S. Ct. at 1128 (adopting the definition of "vessel" found in 1 U.S.C. § 3). By contrast, "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 1127. The focus, therefore, is not on whether the structure is actually engaged in transport, *id.* at 1128, but rather whether "the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one," *id.* at 1128.

Now that the "in navigation" element relied upon by the district court has been effectively subsumed into the definition of "vessel," the salient question before the Court is whether the cleaning barge in this case has been "permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 1127. Like the Supreme Court and our previous case law, I believe that unless the record supports only one conclusion, this fact-intensive inquiry is best left to the fact-finder. *See, e.g., Johnson v. Continental Grain Co.*, 58 F.3d 1232, 1235 (8th Cir. 1995) ("Seaman status is usually a fact-intensive inquiry properly left to the jury to resolve."). We need only look to those cases cited by *Stewart* with approval to see the difficult factual nuances that arise when making such a determination. *See, e.g.,*

-12-

*Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 22 (1926) (floating wharfboat secured to the shore with cables and connected to onshore utilities "was not practically capable of being used as a means of transportation"); *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 627 (1887) (floating drydock was a "fixed structure" that had been "permanently moored" to the mainland by chains and spars, rather than a vessel that had been temporarily anchored); *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 570 (5th Cir. 1995) (floating casino was no longer a vessel where it "was moored to the shore in a semi-permanent or indefinite manner").[3]  From these cases, we know that a vessel may be "permanently moored" simply by being "secured to the shore by four or five cables" and connected to onshore utilities.  *Evansville*, 271 U.S. at 21.  However, seemingly permanent moorings do not necessarily preclude the regular use of the structure as a means of transportation.  *Id.* at 20-21 ("Each winter [the wharfboat] was towed to Green River harbor to protect it from ice."); *Pavone*, 52 F.3d at 564 ("[T]he barge floats on navigable waters, its quite substantial dockside attachment to land is indefinite, if not permanent, save only for its ability to be unmoored and towed to sheltered waters in advance of approaching hurricanes or other violent weather.").  Also, that a structure "move[s] to conform to the stage of the river," *Evansville*, 271 U.S. at 21, or "floats on the water does not make it a ship or vessel," *Cope*, 119 U.S. at 627.

Admittedly, the parties claimed at oral argument that there were no facts in dispute.  At this juncture, however, I believe that the factual record regarding Canton's cleaning barge is inadequate to reach the conclusion that it is a vessel under the Jones Act.  More particularly, I believe the record is insufficient to judge as a matter of law whether the barge is permanently or semi-permanently moored.  All we know is that the cleaning barge is a stationary staging platform for cleaning other

---

[2]*See also Kathriner*, 975 F.2d at 660 (floating processing plant was no longer a vessel where a "large opening [had been] cut into her hull," rendering her incapable of moving over the water).

barges. For this purpose, a generator, water pumps, vacuum tanks, cleaning tools and communication equipment are kept on the cleaning barge. It is incapable of independent locomotion and is presently anchored by massive steel piers that are driven through the deck and hull of the cleaning barge and into the Mississippi River riverbed. During Bunch's year-long tenure with Canton, the cleaning barge was once hauled from the Illinois side of the Mississippi to the Missouri side. Otherwise, according to Bunch, "[s]ometimes strong currents can shift the barge."

Summary judgment might be appropriate if we knew how often Canton moved the barge prior to Bunch's employment, whether Canton ever intends to move the cleaning barge in the future, and how often other cleaning barges in the area are moved. Presently, we do not even know how difficult the cleaning barge would be to unmoor or if it would be seaworthy after the spuds were removed. I think it would also be useful to know whether the cleaning barge is registered or licenced with a governmental authority or otherwise subject to governmental inspection as a vessel. Further, I think it might be important for the parties to elaborate on whether the cleaning barge merely moves along the spuds with the rising tide or whether the current actually causes the spuds to bend or otherwise move off the cleaning barge's mooring. Other relevant facts might include how far offshore the cleaning barge is moored and what legal arrangements, such as leases or mooring rights, Canton had to make to secure the cleaning barge's present mooring. These facts, as well as others not easily anticipated at this stage of the case, may well prove indispensable in properly classifying Canton's cleaning barge. Accordingly, I believe it would be prudent to allow the parties to develop the record in light of *Stewart*.

For these reasons, I respectfully dissent from the Court's holding that Canton's cleaning barge is a vessel for purposes of the Jones Act.

_____