**Ralph GIPSON, Plaintiff,**

v.

**KAJIMA ENGINEERING AND CONSTRUCTION, INC., Defendant.**

**No. CV 96–7761 ABC (Mcx).**

United States District Court, C.D. California.

July 7, 1997.

Preston Easley, San Pedro, CA, for Plaintiff.

Michael J. McLaughlin, Porter, Groff & Lodwick, Long Beach, CA, for Defendant.

ORDER RE: Kajima's Motion
for Summary Judgment

COLLINS, District Judge.

Defendant KAJIMA ENGINEERING AND CONSTRUCTION, INC.'s Motion for Summary Judgment came on regularly for hearing before this Court on July 7, 1997. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Defendant's Motion is GRANTED.

## I. Procedural Background

On November 5, 1996 Plaintiff RALPH GIPSON ("Gipson") filed a Complaint for damages against Defendant KAJIMA ENGINEERING AND CONSTRUCTION, INC., alleging that the Court has federal question jurisdiction over this action pursuant to the Jones Act, 46 U.S.C. App. § 688. On November 18, 1996, Gipson filed a First Amended Complaint ("FAC"). On November 22, 1996, Kajima filed an Answer to Plaintiff's FAC. On February 3, 1997, Gipson filed a Motion for Leave to File a Second Amended Complaint. Kajima filed a Non-Opposition to the Motion and the Second Amended Complaint ("SAC") was deemed filed on February 18, 1997.

Gipson's SAC incorporated three causes of action for: (1) negligence; (2) unseaworthiness; and (3) maintenance and cure. In relevant part, the SAC contains the following allegations:

1. During all times mentioned herein, Kajima was the owner and operator of a certain barge known as YFN–946 and a skiff (workboat). [See SAC ¶ 4].

2. At all times mentioned herein, Gipson, an employee of Kajima, was assigned to the crew of said barge as a piledriver/rigger and was an operator and crewman for said skiff. [See SAC ¶ 5].

3. On or about March 2, 1996, while said barge was in navigable waters in Los Angeles Harbor adjacent to the Henry Ford Bridge, Gipson suffered severe and disabling injuries aboard said barge when a coupling on a dredging pump exhaust hose being supported by a crane on said barge parted and caused the exhaust hose to fall on Gipson, severely injuring him. [See SAC ¶ 6].

4. Gipson is entitled to damages as a result of Kajima's negligence, failure to provide a seaworthy vessel, and failure to pay maintenance and cure. [See SAC ¶¶ 6–15].

On May 9, 1997, Kajima filed the instant Motion for Summary Judgment. In brief, Kajima's Motion is brought on the grounds that Gipson was not a seaman at the time of his injury and, therefore, has no cognizable claim under the Jones Act or under the general maritime law.[1] On May 19, 1997, Gipson filed his Opposition to Kajima's Motion. On May 27, 1997, Kajima filed its Reply.

## II. Factual Background [2]

Defendant Kajima is a construction contractor hired to reconstruct the Badger Avenue Railroad Bridge, which crosses the Cerritos Channel of Los Angeles' inner harbor at Henry Ford Avenue. The reconstruction involves reinforcement of the two bridge footings, replacement of the center span, and replacement of the lift mechanism. In order to reinforce the submerged bridge footings, the footings are first enclosed by a cofferdam formed by a ring of corrugated sheets of steel driven into the river bottom. Seawater

---

**1.** Kajima asserts that Gipson's claims are properly addressed by the Longshore Workers and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et seq.

**2.** The Court's findings of fact, as stated in the "Factual Background" section in this Order, are derived wholly from Defendant's Statement of Uncontroverted Facts, which is adequately supported by admissible evidence. In his Statement of Genuine Issues of Material Fact, Plaintiff has completely failed to controvert any facts set forth in Defendant's Statement. Instead, Plaintiff has merely stated questions of fact and law, which are unsupported by any citations to evidence creating a genuine issue of fact on any of these questions. Pursuant to the Local Rules, "the Court will assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Issues' and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 7.14.3 (emphasis added).

is then pumped out of the cofferdam to create a dry work area. As the water level inside the cofferdam is lowered, steel I-beams are installed in rings around the inside perimeter of the cofferdams to resist the pressure of water outside the cofferdam. Once in place, the steel I-beams are referred to as the "whale frame."

Plaintiff Gipson was dispatched by his union, Local 2375 of the Wilmington Pile Driver's Union, to serve as a rigger and pile driver for Kajima in the reconstruction of the bridge. He was not assigned to any barge or skiff.[3] Gipson's duties were those of a general pile driver and required him to perform a variety of tasks on land, on the bridge, on the cofferdam whale frames, on floating work platforms, and in the skiff, as the exigencies of a given project demanded. However, while Gipson worked on a barge at times, he did not work *for* a barge. Much of the work he did on barge YFN–946 could have been performed either on the barge or on land. Further, the skiff was not assigned to one person and, while the bridge, cofferdams, and barges were all accessible by land, Gipson and all of the other pile driver/riggers operated and rode in the skiff as a convenient method of moving about the work site.

At all times relevant herein, Gipson lived in Long Beach, drove to the bridge work site each morning, and parked his car on the North side of the bridge by the Kajima offices. Gipson has never carried seaman's papers, never worked on a ship at sea, and never held a Coast Guard license. On the other hand, he possesses a crane operator's license, a Class One driver's license (to operate semi-trucks needed to move cranes from place to place), a forklift operator's license, and he is a certified welder.

*Gipson's Pre–Injury Duties at Kajima*

Gipson worked for Kajima for just *eight days* before he was injured. On February 22, 1996, Gipson reported to Kajima's project superintendent and was put to work building wooden safety handrails on the bridge, which he did for two or three days. During that time, he was also required to exchange empty oxygen bottles for full bottles on the bridge and on the 4500 crane barge.

After building the handrails, Gipson was instructed to help lay an exhaust hose across the 200 foot channel. This task required him to load sand bags onto a wooden float,[4] tie the bags to the exhaust hose, lower the hose into the channel from the wooden float, and connect the exhaust hose to the pump hose from the whale frame. The task also required the use of the skiff[5] to help maneuver the wooden float. It took most of one day to lay the exhaust hose.

On his fourth day at Kajima, Gipson was required to remove debris from deck barge YFN–946. He then built a wooden ramp from shore to the barge so that a hydraulic crane could drive onto the barge, and he helped place the crane on the barge.

Deck barge YFN–946 was thirty feet wide and one hundred feet long. It had no navigational equipment, no lights, no means of self-propulsion, no crew quarters or shelter, no bilge pumps, and no deck winches. It was neither registered with nor inspected by the U.S. Coast Guard. The hydraulic crane was placed aboard barge YFN–946 for the purpose of handling and maneuvering the pump hoses used in evacuating the cofferdams.

On his fifth day, Gipson's work included the following tasks: (1) He used barge YFN–946 as a situs for fabricating pad eyes from an H-beam, which took about four hours, and welding the pad eyes onto the deck of the barge to secure the crane; (2) He rigged equipment, which was lifted by the hydraulic crane, from barge YFN–946, from the bridge trestle, from the whale frame, and from other

3. The skiff at issue in this case was a small steel work boat propelled by an outboard motor.

4. The wooden float was a small raft constructed of wooden planks, between eight and twenty-five feet long and six and twelve feet wide. It was used as a floating work platform.

5. Foreman Marvin Germany operated the skiff on the day the Gipson assisted in laying exhaust hose across the channel. Gipson and other workers worked from the small wooden float. [Gipson Depo. at 22:12–23:19]. Gipson also worked from the skiff at times during the hose laying operation. While in the skiff on that day, Gipson held lines tethered to the small wooden float. [Germany Depo. at 8:14–9:20].

barges; and (3) He cleaned debris from the deck of barge YFN–946.

On his sixth and seventh days at Kajima, Gipson constructed and connected the pump pipes and hoses to be used in evacuating the cofferdams, using the barge as his work platform. He connected twelve-foot pipe sections with rubber gaskets, clamps and turnbuckles, then attached the exhaust hose to the pipeline. Gipson also built a siphon, again using the barge as his work platform.

On his eighth day, at the beginning of the shift, Gipson was injured while standing on the whale frame of the south cofferdam. He had just arrived at work and was assisting in the movement of the pump within the cofferdam when a hose coupling broke and a hose fell onto and injured his right leg.

At all relevant times herein, deck barge YFN–946 was used as a work platform to support and facilitate the evacuation of the cofferdams by allowing pump and crane access to the interiors of the cofferdams, and was used as a situs for construction from which Gipson fabricated steel pad eyes, built pump pipes and hoses, constructed a siphon, welded, and rigged equipment.

Kajima contends that deck barge YFN–946 was not engaged in navigation, during the course of Gipson's employment. It never left the job site, but moved only around and between the two bridge footings as necessary to allow access to the cofferdams. The barge was generally in tight quarters next to the cofferdams and was always tied off to something, even when its position was being adjusted about the bridge footings and cofferdams.

*Gipson's Post–Injury Duties at Kajima*

Gipson returned to work two days after his injury, after undergoing surgery, and was reassigned to manage the pump outtake hose. He was then made foreman in charge of the safety handrail projects on the bridge. Gipson also unloaded equipment and materials delivered to the worksite from trucks and carried material to the bridge trestle using a forklift. He also fabricated brackets in the yard.

Gipson continued to work at the bridge reconstruction site for almost five months after his injury. His last day working for Kajima was July 26, 1996.

### III. Discussion

#### A. Summary Judgment Standard

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). Furthermore, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. at 2553–54. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 248, 106 S.Ct. at 2510; *Griffeth v. Utah Power & Light Co.*, 226 F.2d 661, 669 (9th Cir.1955).

## B. Analysis

The essential issue presented by Defendant Kajima's motion is whether Plaintiff Gipson was a "seaman" as that term is defined under the Jones Act.[6] The question of seaman status under the Jones Act is normally for the trier of fact to decide. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 362–64, 115 S.Ct. 2172, 2187, 132 L.Ed.2d 314 (1995). However, the question of who is a "seaman" is a mixed question of law and fact,

and in cases where the facts and law will only support one conclusion, the Court may remove the issue from the jury's consideration and enter summary judgment. *Id.* at 368–70, 372–74, 115 S.Ct. at 2190, 2192. In fact, summary judgment on seaman status is "mandated where the facts and the law will reasonably support only one conclusion." *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991).

In *Chandris*, the Supreme Court articulated a two-prong general standard for determining seaman status. In order for an employee to be considered a "seaman" under the *Chandris* standard, the employee must: (1) have duties that "contribute to the function of the vessel or to the accomplishment of its mission;" and (2) "have a connection to a vessel in navigation (or identifiable group of such vessels) that is substantial in terms of both its duration and nature." *Chandris*, 515 U.S. at 368, 115 S.Ct. at 2190.

In the instant motion, Kajima asserts that Gipson fails to meet the second requirement articulated in *Chandris*. Kajima argues that Gipson's involvement with the two "vessels" alleged in this action (barge YFN–946 and the skiff) does not confer seaman status upon him. Specifically, Kajima argues that: (1) barge YFN–946 was merely a floating work platform and was never a vessel that was "in navigation;" and (2) Gipson's connection to the skiff was not "substantial in terms of

6. The Jones Act provides a cause of action in negligence for "any seaman" injured "in the course of his employment." 46 U.S.C. App. § 688(a). Under general maritime law prevailing prior to the statute's enactment, seamen were entitled to "maintenance and cure" from their employer for injuries incurred "in the service of the ship" and to recover damages from the vessel's owner for "injuries received by seamen in consequence of the unseaworthiness of the ship," but they were "not allowed to recover an indemnity for the negligence of the master, or any member of the crew." *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903). "Congress enacted the Jones Act in 1920 to remove the bar to suit for negligence articulated in *The Osceola*, thereby completing the trilogy of heightened legal protections (unavailable to other maritime workers) that seamen receive because of their exposure to the 'perils of the sea.' " *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354, 115 S.Ct. 2172, 2183, 132 L.Ed.2d 314 (1995) (citations omitted). "Justice Story identified this animating purpose behind the legal regime governing maritime injuries when he observed that seamen 'are emphatically the wards of the admiralty' because they 'are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour.' " *Id.* "Traditional seamen's remedies ... have been 'universally recognized as ... growing out of the status of the seaman and his peculiar relationship to the vessel, as a feature of the maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to the sea in ships are subjected.' " *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 354, 111 S.Ct. 807, 817, 112 L.Ed.2d 866 (1991), *quoting, Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 104, 66 S.Ct. 872, 882, 90 L.Ed. 1099 (1946) (Stone, C.J. dissenting).

both its duration and nature."[7] For reasons articulated below, the Court agrees.

### 1. Whether Barge YFN–946 Was "In Navigation"

■ Kajima argues that it is entitled to summary adjudication of the issue of whether barge YFN–946 was "in navigation" during the time in which Gipson had a connection to the vessel. Removing the issue of whether a vessel was "in navigation" from the jury's consideration is appropriate in cases where the facts and the law will reasonably support only one conclusion on the issue. *See Chandris*, 515 U.S. at 372–74, 115 S.Ct. at 2192. In this case, the only reasonable conclusion is that barge YFN–946 was not "in navigation" during the time relevant to Gipson's connection to the barge.[8]

The facts in this case are quite similar to those in *DiGiovanni v. Traylor Brothers, Inc.*, 959 F.2d 1119 (1st Cir.1992) (en banc), *cert. denied*, 506 U.S. 827, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992), and persuade the Court to reach a similar result.[9] In *DiGiovanni*, a member of the carpenter's union sued under the Jones Act for work he performed on a vessel. The "vessel" at issue was a barge, 100 feet in length, with a 40 foot beam and a raked bow and stern, and with nautical equipment such as navigation and anchor lights. *See* 959 F.2d at 1119. Although the *DiGiovanni* barge had no true means of self-propulsion, it met the commonly understood characteristics of a vessel and, indeed, was inspected by the Coast Guard. *See Id.* at 1120–21. The *DiGiovanni* barge's use during the time relevant to the action was to float at the Jamestown, Rhode Island, Bridge, bearing a crane that was being used for bridge construction. *See Id.* at 1121. The barge's permanent station was at Davisville, Rhode Island, from which it was towed by a tug, from time to time, to perform various shore jobs. *See Id.* It had been at the Jamestown Bridge for a month. It was positioned about the bridge, and moved away from the pilings at night to prevent damage. *See Id.*

Upon the facts listed above, the First Circuit ruled that the *DiGiovanni* barge was not "in navigation" for purposes of invoking the Jones Act. The barge "was simply moved about the piers for working convenience, and at night for safety." *Id.* at 1124. The First Circuit ruled that this movement "was hardly navigation or commerce, and did not diminish the primary nature of the platform's shore use and purpose." *Id.*

In the instant case, the uncontroverted facts show that the use of barge YFN–946 was nearly identical to the use of the *DiGiovanni* barge. Specifically, barge YFN–946 was thirty feet wide and one hundred feet long. It had no navigational equipment, no lights, no means of self-propulsion, no crew quarters or shelter, no bilge pumps, and no deck winches. It was neither registered with nor inspected by the U.S. Coast Guard. The hydraulic crane was placed aboard barge YFN–946 for the purpose of handling and maneuvering the pump hoses used in evacuating the cofferdams.

At all relevant times herein, barge YFN–946 was used as a work platform to support and facilitate the evacuation of the cofferdams by allowing pump and crane access to the interiors of the cofferdams, and was used as a situs for construction from which Gipson fabricated steel pad eyes, built pump pipes

---

7. Kajima's arguments do *not* raise the following issues: (1) whether the barge or the skiff are "vessels;" (2) whether Gipson's connection to the barge was "substantial in terms of its duration and nature;" or (3) whether the skiff was "in navigation." These issues are not before the Court.

8. According to Professor Schoenbaum, "[t]he 'in navigation' requirement is especially important and should be strictly construed in the case of land-based workers assigned to a barge or other floating structure. Such a worker may qualify as a seaman only if the craft is in actual navigation at the time of the accident." Thomas J. Schoenbaum, *Admiralty and Maritime Law*, 2d Ed., § 6–9, p. 273 (West 1994).

9. In *DiGiovanni*, the First Circuit reversed a district court finding, which was based on a jury's answers, that the plaintiff was entitled to seaman status. Sitting en banc, the First Circuit held that if a barge or other float's purpose or primary business is not navigation or commerce, then a worker assigned thereto for a shore enterprise is to be considered a "seaman" only when the barge or float is in actual navigation or transit. *See DiGiovanni*, 959 F.2d at 1123.

and hoses, constructed a siphon, welded, and rigged equipment.

During the course of Gipson's employment, it is clear that barge YFN–946 was not engaged in navigation. It never left the job site, but moved only around and between the two bridge footings as necessary to allow access to the cofferdams. The barge was generally in tight quarters next to the cofferdams and was always tied off to something, even when its position was being adjusted about the bridge footings and cofferdams.

Similar to the movement of the *DiGiovanni* barge about the Jamestown Bridge pilings, the movement of barge YFN–946 around and between the cofferdams surrounding the two bridge footings of the Badger Avenue Railroad Bridge did not constitute navigation. Barge YFN–946 was merely used as a work platform during Gipson's connection to it, and, therefore, was not a vessel "in navigation" under the second prong of the *Chandris* standard.

Gipson argues, however, that the *DiGiovanni* decision was legally incorrect and is not followed in the Ninth Circuit.[10] Gipson argues that this case is controlled by the *Gizoni* trilogy, *Gizoni v. Southwest Marine Inc.*, 909 F.2d 385 (9th Cir.1990) ("*Gizoni I*"); *Southwest Marine, Inc. v. Gizoni*, 502 U.S. 81, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991) ("*Gizoni II*"); and *Gizoni v. Southwest Marine, Inc.*, 56 F.3d 1138 (9th Cir.1995) ("*Gizoni III*"). The Court finds, however, that the *Gizoni* case is factually distinguishable and, therefore, the several *Gizoni* decisions do not require the Court to find that barge YFN–946 was "in navigation" during Gipson's connection to it.

The *Gizoni* case was brought by a rigging foreman, Mr. Gizoni, who worked and *rode* upon several floating platforms, and was injured while working aboard one of those platforms. Gizoni's employer, Southwest Marine, Inc., owned several floating platforms used in connection with ship repair activities. *See Gizoni I*, 909 F.2d at 387. These platforms had no power, means of

steering, navigation lights, or navigation aids. However, they were moved from place to place by tugboats, which positioned the platforms alongside vessels that were being repaired at berths, or in dry dock at Southwest Marine's shipyard, or at the nearby Naval Station. *See Id.* During their voyages to various ship repair locales, these platforms usually transported materials and equipment to be used on the specific ship repair jobs. *See Id.*

Gizoni's specific job duties not only required him to work upon the platforms once they were in position next to the ships, but also required him to "*rid[e]* the platforms as they were used to move equipment, materials, supplies, and vessel components around the shipyard and on to and off of vessels being repaired." *Id.* (emphasis added). When the platforms were being transported by the tugboats, "Gizoni occasionally served as a lookout and gave maneuvering signals to the tugboat operator." *Id.* "He also received lines passed to the platforms by the ships' crews to secure the platforms." *Id.*

In the instant case, there is no evidence that Gipson performed any similar duties with respect to barge YFN–946. There is no evidence that Gipson *rode* aboard barge YFN–946 as it was being transported to the bridge reconstruction site from its prior location. In fact, there is no evidence at all that Gipson ever *rode* on barge YFN–946 when it was unmoored. To the contrary, the uncontroverted facts show that "[t]he barge was generally in tight quarters next to the cofferdams and was *always* tied off to something, even when its position was being adjusted about the bridge footings and cofferdams." *See* Factual Background, *supra* (emphasis added).

As the Ninth Circuit stated in *Gizoni III*, in order to prove that he is a seaman, a plaintiff "must show by a preponderance of the evidence: (1) that the vessel on which he was employed was *in navigation*, (2) that he had a 'more or less permanent connection with the vessel,' and (3) that his job contrib-

---

**10.** Contrary to Gipson's unsupported assertion that the *DiGiovanni* decision was legally incorrect and not followed by the Ninth Circuit, the Court notes that *DiGiovanni* was favorably cited by the Ninth Circuit in *Kathriner v. Unisea, Inc.*, 975 F.2d 657, 661 (9th Cir.1992) and by the Supreme Court in *Chandris*, 515 U.S. at 372–74, 115 S.Ct. at 2192.

uted to the function or mission of the vessel." 56 F.3d at 1141 (emphasis added) (citations omitted). The Ninth Circuit has also noted, in a case decided after both *Gizoni I* and *Gizoni II*, that "[a] vessel is *in navigation* when 'engaged as an instrument of commerce *and transportation* on navigable waters.'" *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567, 569 (9th Cir.1992) (emphasis added) (citation omitted). In this case, the uncontroverted facts show that barge YFN–946 was not engaged in "transportation" of any sort during the time in which Gipson had a connection to it.[11] Accordingly, under the law of the Ninth Circuit, barge YFN–946 was not "in navigation" during Gipson's connection to the vessel.

■ Even if this Court were to find that barge YFN–946 was "in navigation," the Court would still find that Gipson was not a seaman by virtue of his connection with the barge. At bottom, Gipson was a "land-based" worker who is not entitled to seaman status because he never encountered a seaman's perils, which are the basis of the generous relief afforded by the Jones Act and general maritime law. "The requirement that a seaman 'work at sea in the service of a ship' embodies the first basic principle of the definition of 'seaman' that *Chandris* identified:" "'[S]eamen do not include land-based workers.'" *Heise v. Fishing Company of Alaska, Inc.*, 79 F.3d 903, 906 (9th Cir.1996), *quoting, Chandris*, 515 U.S. at 358, 115 S.Ct. at 2185. Moreover, the Ninth Circuit and the Supreme Court have expressly noted that "land-based maritime workers injured while on a vessel in navigation remain covered by the LHWCA ... [and] do not become seamen because they happen to be working on board a vessel when they are injured." *Id.*

In *Heise*, the Ninth Circuit denied seaman status to a plaintiff whose case was based on stronger facts than those in the instant case.

The vessel in *Heise* was a sea-going fishing vessel—clearly a "vessel in navigation." The plaintiff, Mr. Heise, was a temporary laborer assigned to assist in repairs and annual maintenance while the ship was in dock. Like Gipson, Heise never previously worked on a seagoing vessel. *See Heise*, 79 F.3d at 905. Unlike Gipson, Heise slept on the vessel during his period of employment. *See Id.* Unlike Gipson's barge YFN–946, Heise's fishing vessel was moved by a tugboat twice during Heise's employment. *See Id.* When Heise's vessel was moved for a second time, Heise and another temporary worker were *on board* the vessel to receive and secure its mooring lines. *See Id.* Unlike Gipson, Heise's injury was sustained *on board* the vessel.

Despite the facts noted above, the Ninth Circuit denied seaman status to Heise. Because the facts in the instant case are weaker than those in Heise, seaman status must also be denied to Gipson. In *Heise*, the panel held that "Heise was a land-based worker" because he was only hired "as a temporary laborer and only for the duration of the repairs and maintenance [on the fishing vessel while in dock] ... Thus, at the time of Heise's injury, his connection to the [fishing vessel] was to be limited to the time that the vessel was in [dock] undergoing maintenance and repairs. ... Because Heise was a land-based worker, he was not a seaman entitled to the remedies of the Jones Act." 79 F.3d at 906–07.

In the instant case, Gipson makes a weaker argument for entitlement to seaman status. As in *Heise*, it is clear that Gipson was merely a land-based worker.[12] His connection to barge YFN–946 was limited to the time in which the barge would be used solely as a floating, but secured, work platform for the bridge reconstruction project. Therefore, even if the Court assumed that barge YFN–946 was "in navigation" during Gip-

---

**11.** These facts are readily distinguishable from those in the *Gizoni* trilogy, where the floating platforms at issue were clearly involved in transportation during the plaintiff's involvement with them.

**12.** Specifically, Gipson has never carried seaman's papers, never worked on a ship at sea, and

never held a Coast Guard license. On the other hand, he does possess a crane operator's license, a Class One driver's license (to operate semi-trucks needed to move cranes from place to place), a forklift operator's license, and he is a certified welder.

son's brief pre-accident connection to it, the facts and holding in *Heise* prescribe that the only reasonable conclusion is that Gipson was a land-based worker and, hence, was not a seaman with respect to barge YFN–946.

## 2. Whether Gipson Had a Connection to the Skiff That Was "Substantial in Terms of Both Its Duration and Nature"

■ In general, Kajima argues that Gipson was essentially a land-based worker who was not exposed to the "perils of the sea," and, therefore, should not be considered a seaman. Specifically, Kajima asserts that, even if the skiff could be classified as a "vessel in navigation," Gipson's connection to the skiff was sporadic and transitory and did not give rise to seaman status. The Court agrees.

As noted above, the Supreme Court has ruled that one of the requirements for seaman status is "a connection to a vessel in navigation . . . that is *substantial in terms of both its duration and nature.*" *Chandris*, 515 U.S. at 368, 115 S.Ct. at 2190. The express purpose of this requirement is "to separate the sea-based maritime employees from those land-based workers who only have a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.* In this case, Gipson was a member of Local 2375 of the Wilmington Pile Driver's Union, and performed primarily land-based duties prior to his brief employment on the Kajima bridge reconstruction project. Further, Gipson's only arguable connection to a "vessel in navigation" was his presence in a small skiff that ferried Gipson and other workers around the worksite. The uncontroverted facts, listed above, show that Gipson's connection to the skiff was clearly transitory and sporadic, while the vast majority of his work was performed on the bridge, on land, on the barge · (a vessel *not* in navigation), or in the coffer-dams.

Gipson used the skiff primarily as a means of "transitory" transportation about the worksite—a small channel in Los Angeles' inner harbor. The skiff was also used as a means for repositioning a small wooden float, as well as barge YFN–946. The evidence is not clear as to how much time Gipson spent aboard the skiff. On his fourth day of work, Gipson assisted in laying exhaust hoses across the channel. On this day, Gipson worked from a small wooden float and from the skiff. After this day, Gipson declares that he "spent 90% of each day working aboard the barge" (a vessel *not* in navigation). [Gipson Decl. ¶ 8]. "The other 10% of each of those days was spent rigging for the barge and ferrying supplies aboard the skiff." [Id.] Therefore, in summation, after Gipson spent one day divided between laying exhaust hose from a wooden float (not alleged to be a vessel in navigation) and sitting in a small metal skiff holding lines attached to the wooden float, he spent something less than 10% of his time in the small skiff, traveling about the worksite—a small channel in Los Angeles' inner harbor. This evidence is not sufficient for a reasonable jury to find that Gipson was a seaman. Gipson was a land-based worker whose duties involved a transitory and sporadic connection to a small metal skiff within a small inner harbor channel. Clearly, his duties aboard the skiff did not regularly expose him to "the perils of the sea" and his connection to the skiff was *not* substantial in terms of either its *duration* or *nature.*

In several other cases, courts have held that workers were not "seamen" despite the fact that they performed work aboard a vessel in navigation.[13] For example, in *Cabral v. Healy Tibbits Builders*, 1995 A.M.C. 2099, 1995 WL 510326 (D.Haw.1995), the district court held that a crane operator who worked a crane mounted upon a vessel in navigation was not a seaman because there was no indication in the record that he owed a crew member's "allegiance" to the vessel. 1995 WL 510326 at *4. Rather, the plaintiff's con-

---

**13.** *See Cabral v. Healy Tibbits Builders*, 1995 A.M.C. 2099, 1995 WL 510326 (D.Haw.1995) (discussed above); *Browning v. B.F. Diamond Const. Co. Inc.*, 161 Ga.App. 73, 289 S.E.2d 268, 269, *cert. denied*, 459 U.S. 837, 103 S.Ct. 82, 74 L.Ed.2d 78 (1982) (worker on bridge construction project who used vessels to reach piers and footings of bridge was not a seaman because his presence on these vessels was intermittent and incidental to his construction duties).

**546**

nection to the vessel was "at best transitory." *Id.* The *Cabral* ruling was based upon the Supreme Court's rulings in *Wilander* and *Chandris,* as well as Ninth Circuit authority holding that a plaintiff claiming seaman status under the Jones Act and general maritime law "must have a more or less permanent connection with the vessel." *McKinley v. All Alaskan Seafoods, Inc.,* 980 F.2d 567, 569 (9th Cir.1992), *citing, Estate of Wenzel v. Seaward Marine Servs., Inc.,* 709 F.2d 1326, 1327 (9th Cir.1983); *see also Gizoni III,* 56 F.3d at 1141. In the instant case, Gipson did not have a "more or less permanent connection" with the small skiff. The vast majority of his duties were performed away from the skiff, and his connection to the skiff was merely incidental to his construction duties and was transitory at best.

The uncontroverted facts lead to only one reasonable conclusion—that Gipson was not a "seaman" and, therefore, is not entitled to relief under the Jones Act or general maritime law. Accordingly, Kajima's Motion for Summary Judgment must be GRANTED.

### IV. Conclusion

For all the reasons discussed above, the Court hereby ORDERS that Kajima's Motion for Summary Judgment is GRANTED. Gipson was not a "seaman" and, consequently, has no cognizable claim under the Jones Act or general maritime law.

**SO ORDERED.**